God save these United States and this honorable court. Please be seated. We have four cases that are on calendar that will be submitted on the briefs and those are 25-1683 Digna Marina Soto Cruz v. Pamela Bondi, 25-1690 Gusharan Singh v. Pamela Bondi, and in accordance with the respective orders previously entered on the dockets of those cases, those four cases are hereby submitted on the briefs and we will proceed to hear argument in the first case on calendar for argument this morning, which is 24-6466 Eldar Gafurov v. Pamela Bondi and we will hear first from Mr. Adcock. You may proceed. Good morning, Your Honors. My name is Utku Gayripakchuk, appearing on behalf of the Gafurov family, the petitioners. I would like to reserve five minutes for rebuttal, if possible. Your Honors, three things, as far as I understand, are not in dispute. This family are Mascanian Turks and the IJ found them fully credible and the IJ found Mascanian Turks are a disfavored group in Russia. Today, I will be making four arguments and if I have time, I would like to point out other things as well. First, the IJ and the BIA, I believe, mischaracterized the actors and failed to apply the Sharma correctly. Second, I will be talking about the family's unborn baby who unfortunately died in the state hospital. And the third, my client's conscription and his political and imputed political opinion. Can we actually just start with that issue about conscription? Because how is it that the prospect that he would be conscripted, how would that be based on a political opinion or imputed political opinion where it doesn't appear that he's ever expressed one to them? They're not aware that he has this opposition. And what in the record suggests that that's why they would conscript him? They just want to conscript everybody. So they're not particularly discriminatory or selective. They'll just take anyone, you know, who's a male within the age ranges. So I don't see that there is an imputed political opinion. And then how is it on account of? So can you address that, please? Yes, Your Honor. Thank you very much. Your Honor. So actually, we are talking about a person who is a Meskenian Turk who fled to the United States of America for asylum, who fled the country to avoid drafts, and who tells in the court under the penalty of perjury that he doesn't believe in this war. So we are not talking about like a person who lives in Russia, who just doesn't go to the army for some reason. So he is in the United States seeking for asylum, and he avoids the draft. So also, Your Honor, so he is a Meskenian Turk. He's a minority in Russia. I understand the claim that they selectively conscript, and they actually prefer to get the ethnic minorities and send them to the front line in Ukraine. That argument, I understand, is separate. But I'm focusing for the moment on the political opinion argument. And it seems to me that your political opinion argument is in some tension with the Supreme Court's decision in Ilias Sicarius, where the claim was sort of similar. The gangs, you know, are trying to, or whatever, the organization is trying to recruit me. And I have an opinion of opposition. And the court said, well, the fact that they try and recruit doesn't mean that everything is a political opinion. Yes, Your Honor. Your Honor, but I believe that Eldar's situation is a little bit different. So he escapes Russia to seek asylum to the United States. And also, I believe that he might be in danger. Should he go back to Russia, he sought asylum in the United States. And I found one case law, Al Harbi, and asks one question, actually. It says, when this person returns in the case law, what will his government think? So the answer, I think, is parallel to Al Harbi's case. And when he goes back to Russia, I believe that the Russian government might impute the political opinion of, like, evading the Russian wars by seeking asylum in the United States. So I believe it's a little bit dangerous for him in this scenario. I believe he's not a person just living in Russia, avoiding the draft, just, you know, living in Moscow. He's not like that kind of person. He came to the United States of America to avoid the draft, Your Honor. I believe that is a parallel to Al Harbi's case, as far as I understand from the case, Your Honor. And what's the basis for that conclusion you have, that he would be treated worse than someone in Russia who avoided conscription? Your Honor, he—I'm sorry. Yeah, go ahead. Your Honor, I believe that he, you know, he's already treated differently than the other people who are enlisted in the Army. He's a minority group. He is just like a disposable soldier. Even if he complies with the Russian government's enlistment, he's going to be sent to the war field, right, because he's an ethnic minority group. And this is what happens even if he complies. He's being treated badly. And when he comes back from the United States seeking asylum, I believe that he's going to be treated differently than the other people, than the people who are living in Russia and just avoiding just the draft for some reason. So I believe he's going to be treated differently because he also sought asylum in the United States. Are there country conditions evidence or any other evidence of the record that would suggest that? I understand you're saying intuitively that may be the case, but is there something, you know, testimony or country conditions evidence or anything else that would suggest that? I am not aware of that, Your Honor. He just testified that the police came to the door and then he said that he needs to come. Otherwise, there would be consequences. So I believe that he's actually one of the targets. And I believe that he's not just like a general person that just avoids the draft in Russia. And it's just the 10 percent of fear for persecution, Your Honor. I mean, I believe he hits that 10 percent. May I continue, Your Honor? Oh, yes. It's your argument, your time. So if there's not a question, the floor is yours. OK. Thank you, Your Honor. So, Your Honor, also, I would like to talk about I counted almost 30 incidents that he suffered with his family in Russia. And it's all it's all it was all because of his his because of his ethnicity is because of because he's a Muscanian Turks. And he is like almost younger than 40 years old. I mean, 30 different incidents that he endured in Russia. I think it's a lot of incidents. And IJ and BIA just, you know, counted the incidents, says this is not enough. This is not enough. This is not enough. This is not enough. But I believe that they failed to look at the look at the general, like the combination of the harm, the portraits. I believe that they failed to do the Sharma analysis in this case. And I believe that they misidentified the actors because as far as the testimony I see, the state police beat Eldar, threatened to drown him in the Cuban River. State prosecutors warned him the police could do worse. State Farm Collective destroys his crops while Russian neighbors were untouched. So there were a lot of incidents that he endured. But I don't believe that the BIA and the IJ checked the whole totally of the circumstances. And your honor, I also like to talk about the baby, the unborn baby of Eldar. I believe that this is the most serious harm in this record. And I believe that IJ made two errors here. First, he said that Leila, the wife, was not in the position to observe differential treatment because she never left the room. But on cross-examination, when the government asked how she knew others were treated differently, she said it's also in the transcript. Because in one room, there were several people like that. So she was in a shared room and watched other patients get evaluated and treated. And she was able to see it from her own bed. But the IJ, I believe, got the facts wrong there. And also, IJ asked whether genetics or other medical conditions could explain the miscarriage. But Leila said that I don't think so because in 2016, she had the same kind of pains. And then she was able to go to the hospital with the family. And the family pressured the doctors. And then she was able to get some treatment and IV. And she gave birth to Imran, who is thankfully alive today. But in 2020, unfortunately, she didn't get the proper treatment. And her unborn child, unfortunately, died. And the IJ also said that, oh, maybe it is the genetics. That there could be other reasons why she lost her baby. And I believe that this is kind of speculation, respectfully. And I believe that any other person could have just said, okay, then this guy, this person got the treatment in 2016. Did you want to save time for rebuttal? Because you're down to four minutes. Oh, yes, Your Honor. Okay. Oh, yes. All right. Thank you, Counselor. All right. So we'll hear now from Mr. Rabin. Good morning, Your Honors. May it please the Court. My name is Arthur Rabin. I am the Respondents' Counsel in this case. Substantial record evidence supports the agency's determination that petitioners failed to establish past persecution or a well-founded fear of future persecution in Russia. Now, the incidents they described were many, but they were isolated, sporadic, and spread over many years with long periods of no harm. As to their fear of future harm, this claim rests largely on routine military conscription. Well, let me just stop you there. Routine military conscription, when even the IJ acknowledged that the Russian government has a preference, and the country condition report says the Russian government likes to round up ethnic minorities so it can send them to the front line in Ukraine, which the U.S. government considers to be a war, an unlawful war of aggression and violation of international law with numerous human rights violations. So to characterize this as ordinary conscription doesn't seem to be consistent with the record. Well, Your Honor, first of all, that was one. The judge cited a single source. That was one report, not even a government one. Number two, petitioners never raised the fact to the board that their claim is based on ethnic targeting, that the conscription was because they were ethnic minorities. They never raised that claim. They raised the claim that he was fleeing Russia due to conscription. Now, the record shows that the Russians are in such dire need of men. I mean, they're scrubbing the bottom of the barrel at this point. I mean, they're getting North Koreans to fight for them. So the fact that they're looking for him, that's nothing out of the ordinary in Russia. Now, the war itself, whether it's a war of aggression or not, I don't think that's at issue. I think the issue here is did he show that this was something other than generally a call for conscription? And if so, what's the exception here? Is he saying that he will be disproportionately punished when he returns? No, he never argued that. In fact, there's nothing in the record that shows he received any threat other than the police showing up after he left to Turkey and saying, hey, where is he? And if he doesn't show, he's going to be in trouble. Now, that's not saying that the judge issued a warrant for his arrest or the military police were there rounding up his family or any other action was going to be taken against him. So at this point, what we have is a lack of proof of anything other than he's fleeing conscription in military service because he doesn't want to go fight for a country he doesn't believe in. He does not like the Russians because he obviously, for obvious reasons, he was harassed and discriminated against. So he does not want to go there. Now, as far as his claim that he was a conscientious objector, he voiced that to whom? No one. He did never claim to anyone, any public official. In fact, the record shows he never claimed to anyone he was a conscientious objector who would have then imputed a political opinion to him. Now, turning to the past persecution claim, the agency recently concluded that they did not experience what amounted to the harm amounting to persecution. It was discrimination, harassment, a single police assault, a brief period of two hour detention and economic difficulties that did not threaten life or freedom. I want to stop you because, you know, you said a few minutes ago that he did not raise to the board the argument that the Russian government engaged in selective recruitment for the military of ethnic minorities. And I'm looking at his brief before the BIA on page 19. And it says, moreover, respondents submitted evidence showing that minorities in Russia picked by the Russian government to conscribe or picked by the Russian government to conscribe and send into the war zone. The government specifically picks minorities to conscribe and send into the war zone. So that was just what you said before was just inaccurate, correct? I mean, that's right there on the brief. Yes, yes, that is inaccurate. Now, the BIA did not even address this claim. It's not even mentioned in the BIA's discussion of conscription. So here we have an argument, which is, frankly, his best argument. It is, in fact, raised contrary to what you said. And now we have the BIA just blows past it without any consideration. So why shouldn't we send this back? Because, you know, this is a serious claim. And maybe the BIA needs to take a look at this. Well, because before the immigration judge, he submitted a very lengthy, single space, eight page statement. He testified, his wife testified, his brother, his brother-in-law, his parents all submitted statements. None of that stated that he was claiming that he was being sought by the Russian authorities. They're raising a whole menu of claims. They don't want to go back. Everyone understands they don't want to go back. And they've made every argument, but you're allowed to make five alternative arguments. And it could be that four of them have nothing to them. And not all of them need to mutually support each other. But here we have one argument, which does, you know, seem to have some legs and we don't the BIA. It was presented to the BIA and the BIA ignored it. Well, you're I think the BIA did not ignore it. It's just a they reviewed what he raised and the evidence showed. And as Mr. Hitchcock stated, the most severe thing that they're raising is the miscarriage of the wife's baby. So even now, the center of gravity, the center of mass for their argument is not this. So it is not unreasonable for the board never to have reached the argument because it was never meaningfully raised to the board in a way that the evidence reflected that. Because if the board is sent back, this case was sent back and remanded. And then the board is going to take a look at this. They're going to say there was a single instance in one non-government report that shows that the Russian authorities are disproportionately targeting minorities for the draft. He never claimed that to the immigration judge. He never said none of his statements or testimony or the immigration judge specifically noted in a footnote that that evidence had been presented. Now, the immigration judge noted it and then didn't do anything with it, but at least the immigration judge acknowledged it. But then the BIA didn't didn't address it at all. They didn't address it because it was in a footnote that was never meaningfully raised by petitioner. And, you know, the petitioner was represented by counsel in front of the immigration judge. And that was not the focus of his claim. It was not that he was being targeted for the draft because he is a Misketian Turk. He was just wanting to escape the draft regardless of how they came to his door. So to send this case back would, I think, not lead to a different. I mean, I think the court can convince himself that it would not lead to a different result and that this was harmless error because even he never argued that. In fact, he didn't argue that here. I also I'm looking now. I think you said that this was mentioned in one report and it wasn't a government report. Is that correct? It was mentioned in a report.  Let me see. It was some kind of house. I'd have to find it, Your Honor. Again, I'm looking at the record. I'm at page 681 of the administrative record, which has Russia 2002 human rights reports. And it says at the bottom country reports on human right practices for 2022 United States Department of State. And then you go. It's quite a ways into the report, but it specifically has a statement about the selective recruitment of minorities. I noted it in the 56 of the report going to 57. So it's administrative record 737. So there were reports Russian authorities disproportionately mobilize members of non-Russian ethnic groups to fight in Russia's war against Ukraine. So your statement that that was not an official government report was also not accurate. I'm sorry, Your Honor. Where are you pointing that to? Page 56. Page 737 of the administrative record. It says. It's right on the top of the page. First full paragraph. Your Honor, I know your restriction. Senior government official. Yeah, I'm not seeing that on page 56, Your Honor. No, it's it's page 737 of the administrative page. 57 of the report.  Yeah. Yes, sure. Okay. I see that now. Again, I apologize to the court. I did not see that earlier. As I noted in my brief, it was contained in a different report. But again, the focus of my argument is that this is not a claim that was meaningfully made to the immigration judge that said, I am fleeing Russia because of ethnic persecution, given that they are seeking minorities and targeting minorities for conscription. That was never argued to or raised to the immigration judge, other than in this report, which the immigration judge, in fairness, mentioned, and so did the board. And so, you know, so did I, in the statement of facts. Just to be fair, but I don't think that was, as presented today, was the focus of their argument. The focus of their argument is that he was fleeing conscription, just general conscription. Not because he's a Meskhetian Turk, other than the fact that he's been persecuted his whole life and he didn't want to join because he said, one, he's a conscientious objector, and two, he testified he didn't want to fight for the Russians. To continue, Your Honors, so even cumulatively, the incidents that they raised do not rise to the severe persecution that they've alleged. This court has repeatedly held that isolated incidents without serious harm do not compel a finding of persecution. Petitioners remained in Russia for more than two decades after the 2002 incident without similar violence against Mr. Gafurov. That strongly supports the agency's conclusion and denial of asylum. Now, without past persecution, petitioners can still show an objective of reasonable fear, but they have not done so. As noted, petitioner argued that he was a conscientious objector. But military conscription by itself, as noted, is not grounds for asylum. And this court has held that repeatedly in a case called Zahatiye and others. In any event, he was classified as having very limited military capability because he never actually served in the Russian military before when he was a young man. He lacked military training, and he never expressed any political opposition publicly so as to establish his conscientious objector status. Moreover, and this is just as important, his voluntary return following his departure to Turkey, after he learned of the conscription of men his age, shows that it undercuts or at least weakens his claim of having an objectively reasonable fear of persecution in Russia. Now, moving on to his disfavored group claim, even though petitioners were Musketeers and Turks and were part of a disfavored group, that alone is insufficient. They must still show individualized risk. Now, there was no threats against them individually. There's no actual government or proof of government interest in petitioners. And there's no evidence they will be targeted personally because other than the one brief visit by the draft enforcement people, there has been no official contact with any of his relatives in Russia. Finally, as a pattern of practice, petitioners also claim a pattern of practice of persecution, but that requires systemic pervasive persecution of an entire group. But the country conditions have shown that, yes, there is discrimination, strong societal bias, economic hardship, but not systemic persecution by the Russian government or that it tolerates de facto discrimination. Petitioners themselves lived in Russia for decades, were issued Russian passports, were able to leave freely without severe harm. That evidence also supports the agency's conclusions. Now, petitioners also raised a number of other claims, including due process. But as noted in our brief, there was no exhaustion of those claims. Thus, their claim that their hearing was fundamentally unfair because of interpreter errors or that the judge somehow mistakenly referenced the date of his return, that claim the petitioner voluntarily returned is undisputed. What they're disputing is the actual date he returned and that the IJ mistakenly noted in his decision. But the board actually went back and went through the chronology and got it right. So in this case, I do not think there was a fundamental unfairness as to the hearing. Subject to the court's questions, that concludes my argument. All right. Thank you, counsel. We'll hear rebuttal now. Thank you very much, Your Honor. Your Honor, I believe you submitted the state, the evidence, the Department of State reports, and then it says that ethnic minorities are sent to the war field as a disposable soldier. So I believe that the reason why he also doesn't want to be enlisted in the army is because he's going to be sent to the war field, because he's going to be treated differently. So where before the IJ did you assert the claim that the Russian government engaged in differential recruiting and targeting ethnic minorities? Your Honor, I do not remember precisely, but as far as I remember and because the IJ noted there, I believe that we actually asserted that point, but I am not sure about this. But I do. I am sorry if I am wrong, but I believe that we did. And I believe that that's why the IJ actually highlighted that point. Did you just have the, you know, the I-589 and the attachments and that an oral presentation? Or was there also, sometimes there's a written brief to the IJ from the, in the IJ proceeding there, the respondent. Did you, do you recall whether you submitted such a document in this case or it was just the application and the oral argument? Your Honor, as a practice, we actually submit the legal brief for all asylum clients. Even at the IJ stage? Yes, Your Honor. All right, so we can look at that document then. I believe so, Your Honor, yes. Yes, so as to the returning to Russia, Your Honor, I would like to answer that too. So, I mean, he went one time and he stayed 16 days. And the reason why he went back is to rescue wife and children. And actually IJ said that he went back for 30 days, which was not wrong. And then I think he corrected himself in the written decision. But he just went back to rescue wife and children. So, and he actually had some incident because the military called him personally on the day 12 and the fled on the day 16. And after he fled, the police came. He found credible. And there are two similar cases, Loho and Hakim. And I think it's very different than what our situation is right now, Your Honor. Also, I would like to point out the disfavored group. The disfavored group, Your Honor, I believe that the law is simple here. Because the more group persecution you show, the less individual evidence you need. This is my understanding. And the less group persecution, the more individual evidence you need. So, they kind of work together. And the government says that the group threat is low. Okay. But when you look at the individual evidence, I mean, police beat him in 2002. Doctors destroyed his field while Russian neighbors were untouched. The military called him by name. He lost the baby because he was not, she was not getting a proper treatment. I counted 30 incidents from his written and oral declaration, Your Honor. I don't really, I think I need to learn more. But there are so many incidents that he endured. And when you look at the totality of circumstances, I believe that he was actually persecuted in Russia as a Meskenian Turk, Your Honor. So, that concludes my argument, Your Honor. All right. Thank you, counsel. The case just argued will be submitted. Thank you, Your Honor.
judges: COLLINS, LEE, Fitzwater